Johnson, J.,
dissenting. With the utmost respect for the majority of the court, I am impelled to place my dissent on record in this case.
I am convinced that the statute involved violates constitutional provisions which are in a very unusual sense the clear expression of the will of the people written into the fundamental law by the people themselves.
The ground upon which I dissent is the simple clear language of the constitution. As the genesis of the initiative and referendum provisions of the constitution is found in the popular will formed in the slow and sure processes of experience, so the disregard of those provisions by the legislature is a thing much to be regretted, because of its effect upon the confidence of the people in the strength of constitutional government.
No part of the fabric of the constitution of our state was ever adopted which was more generally discussed by those favoring and those opposing than the provisions involved in this case. After that discussion the people, only a few years ago, by a large majority, wrote them into their constitution. That those provisions were prepared with very *633 great care and scrutiny is evident from the most casual or the most careful reading. The framers were not content to adopt the initiative and referendum provisions in general terms; the reservation to the people of the legislative power therein contained is not only emphatic and explicit, but is safeguarded by careful, clear and elaborate provisions. More than four pages of the printed constitution are occupied by these comprehensive provisions. In order to assure full vitality and save the reserved right from any possible interference or obstruction, it is expressly ordained that the provisions in the initiative and referendum section shall be self-executing, and then follows the solemn sovereign admonition — the concluding clause — “Laws may be passed to facilitate their operation, but in no way limiting or restricting either such provision or the powers herein reserved.”
Recognizing that laws providing for tax levies, appropriations for the current expenses of the state government and state institutions, and emergency laws necessary for the immediate preservation of the public peace, health or safety, should go into immediate effect, the people so provided. But they were not willing even to make this proviso without safeguards, and so they required in Section Id of Article II that such emergency laws could only be passed upon a yea and nay vote, that they must receive the vote of two-thirds of all the members elected to each branch of the general assembly, and that the reasons for such necessity should be set forth in one section of the law, which section shall *634 be passed only upon a yea and nay vote upon a separate roll call thereon.
Every legal authority and every court which has spoken with reference to rules for the construction of constitutions has said that the language, because it is the language of the people, must be construed in its plain popular sense. The plain people of Ohio placed this proviso in the constitution, knowing that they were saying what they meant and believing that the legislature and the. courts would construe it to mean what they said, namely, “emergency laws necessary for the immediate preservation of the public peace, health or safety.” That is, there must be an emergency and the law must be necessary for the immediate preservation of the public peace, health or safety. When a thing is necessary for the immediate preservation of another thing, the only conceivable conclusion is that, that other thing is in danger, and that the danger is of such a character that unusual and extraordinary steps are necessary to be taken at' once to prevent the destruction of the thing to be preserved. The necessity of a law for the preservation of the public peace, health and safety implies that unless the law is passed the public peace, health and safety will be destroyed, or seriously impaired.
The constitution commands that it is only when such a law is passed that the people can be deprived of the referendum. Then after the emergency law has received the two-thirds vote of all the members elected, the reasons for such necessity are required by the constitution to be set forth. That is to say, *635 that, along with the law itself, the reasons for the necessity of its going into immediate effect must be stated, so that all the people can see why they are to be deprived of the right to participate in the making of that law. And the only possible ground for the setting forth of the reasons is that the people in making the constitution wanted the right and the opportunity to see if the reasons were such as to show that the law was passed in an emergency, an exigency, and was necessary for the immediate preservation of the public health, peace or safety. And they wanted the further right to have their courts scrutinize and examine the reasons; and if on their face it is seen that the reasons given are not valid reasons -why the law should be passed as an emergency or is necessary for the immediate preservation of the public health, peace or safety, the court should so declare and restore to the people their right to pass upon the legislation by the referendum which they have so carefully ordained.
It is the duty of the court to ascertain and determine whether the legislature has in any way wrongfully restricted “the powers herein'reserved.”
The decisions of the courts of some of the western states have been cited in the briefs of counsel on both sides. Those decisions are not in harmony. However, research discloses that the provisions in the constitutions of those states are different from those in Ohio in some essential respects, some of them not differing so much as others. Although the view we have here indicated is supported by the decisions of some of those states in opinions of great force and cogency, an extensive examination *636 of them would not be of assistance here, for the reason stated, and for the further reason that an inspection of the Debates of the Ohio Constitutional Convention shows that our provision, Section Id, was the result of much discussion and deliberation and was adopted after a number of other drafts in different language had been proposed and considered. This fact also appears in the majority-opinion in this case. The provision finally- adopted expressed the best judgment of the constitutional convention after that full deliberation, and is the one which the legislature and the court are sworn to enforce.
The essential difference in reference to the provisions of other states, as throwing light on the decisions of some of those states, consists in the fact that in Ohio there is the explicit direction which I have pointed out, that the reasons for such necessity shall be set forth in the law; and so far as this state is concerned there is the unavoidable conclusion that it was required that these reasons should be there set forth for the purpose of having them laid before the people and the court in order to test their sufficiency.
It would be a vain and meaningless thing to hold that after some pretended reasons had been stated in the law, no further attention could be paid to them by the people or the courts, however irrelevant they might be, or however much they might fall short of anything like real reasons showing the necessity for the immediate preservation of the public peace, health or safety.
Moreover, this court has explicitly settled the *637 question whether the action of the legislature in passing a law, and its simple declaration that an emergency exists, are sufficient to close the door against the court, to operate to deprive the people of the right of referendum, and to abolish the plain provisions of the constitution and destroy the “powers herein reserved.”
In County of Miami v. City of Dayton, 92 Ohio St., 215, it is declared in the syllabus: “The judgment of the general assembly as to the emergency character of an act under the constitutional amendment of 1912 is not conclusive, but its judgment in that behalf may be challenged in a proper proceeding at any time within the ninety-day period, either as to the constitutional vote or the emergency character of the act.”' And it must be noted that a very significant feature as to the syllabus in that case is that it bears on its face the clear evidence that the syllabus had the careful study and attention of every member of the court, and further that this particular paragraph of the syllabus received the emphatic approval of every member of the court. This is manifest from the fact that three members of the court dissented from proposition 4 of the syllabus, which related to the validity of a three-tenths mill levy provided for in the act. All the other propositions in the syllabus, including that relating to the emergency character of the act, received the affirmative approval of every member of the court.
In view of that deliberate conclusion, that question must be regarded as decisively settled so far as Ohio is concerned.
*638 I have referred to this phase of the case only because it is seen from the opinion of the majority that there are two judges who hold a different view. However, it also appears from the opinion of the majority in this case that two members of the majority concur in the view that I have stated above. It is, therefore, seen that there are five members of the present court who hold to the view that it is the duty of the court to examine and pass upon the emergency character of the act, and that the action of the general assembly is not conclusive in that behalf.
Likewise has the question of what constitutes emergencies received the comprehensive study and decision of this court.
In State, ex rel. Menning, v. Zangerle, Auditor, 95 Ohio St., 1, after defining on page 8 the word emergency as (1) “A sudden or unexpected happening; an unforeseen occurrence or condition; specifically, a perplexing contingency or complication of circumstances” and (2) as “A sudden or unexpected occasion for action; éxigency; pressing necessity,” it is said: “It is difficult to conceive of a road becoming out of repair from any cause other than one of those enumerated in Section 7419, to'-wit, freshet, landslide, wear of watercourses, or other casualty, or by reason of the large amount of traffic thereon, neglect or inattention to repair. * * * The condition occasioned in a manner stated in our first classification constitutes an ‘emergency.’ It is the result of a sudden or unexpected happening, an unforeseen occurrence, an extraordinary condition; while a condition arising under our second *639 classification has to do only with injuries resulting naturally and necessarily from the use of the roads, or from mere neglect or inattention of the county commissioners, which could readily have been foreseen and cared for by the usual and ordinary methods. The one condition is extraordinary and unforeseen, the other natural, usual and to be expected. The one class constitutes an emergency, the other certainly does not.”
Now, take the law that is involved in this case. The purpose of it, as stated in its title in accord*ance with constitutional requirement, is “To establish an administrative code for the state, to abolish certain offices, M create new administrative departments and redistribute among them existing administrative functions, and for such purposes enacting * * * [here follow the numbers of the chapters and sections to be amended or repealed] and to declare an emergency.”
There is absolutely no relation whatever between any of the purposes stated in 'the title of the act and an emergency. Let the reader of this opinion read that title over again and think about it. Then look at the law itself. It reorganizes practically the entire executive branch of the state government, with the exception of the Secretary, the Auditor, the Treasurer and Attorney General of the State. Nine new executive departments are formed, and upon these new executive departments are conferred the duties and powers heretofore vested in other officers of the state, and their offices are abolished.
A close study of the provisions of the act fails *640 to discover any provision which would lead anyone to think that it was being adopted as an emergency law to meet • the necessities of a sudden or unexpected occasion or exigency for the immediate preservation of the public health, peace or safety, or that it was being passed to meet, as stated in the Zangerle case, supra, a condition which is extraordinary and unforeseen.
The provisions of the old law with reference to the Adjutant General, whose duties are closely related to the preservation of' the public peace and, safety, are unchanged. The office of State Fire Marshal is embraced within the provisions of a new department, but his duties concerning the public safety are in no wise enlarged or changed; and there is nothing to indicate that any provisions are being made to accelerate or strengthen the efficiency and the power of either the Adjutant General or the Fire Marshal. The same remark must be made with reference to the Department of Health. As to that department all the provisions of the new law are contained within two short sections, and in those two sections the provisions merely are that the laws already in existence shall apply to the new Health Department.
Surely it would seem to be clear that the legis-. lature did not feel that the governmental machinery already provided and long in existence for the preservation of the public health, peace and safety was weak and inefficient, or that it was confronted with an emergency which necessitated a law for the immediate preservation of the public peace, health and safety.
*641 Not only is there nothing in the entire body of the law to indicate that there is any emergency which makes necessary the. passage of such an emergency law, nor to indicate that the provisions of this particular law have any relation to such a subject, but the reasons for such necessity as set forth in Section 5 of the act utterly fail to disclose any such necessity, or such emergency.
Look at those reasons!
It is stated, first, that the 83d General Assembly, which met over two years ago, created a joint legislative committee to investigate all of the offices with a view of centralizing the duties of the various departments, eliminating such as are useless, and securing such a reorganization of the government as will permit greater efficiency and greater economy. It is then stated that the committee made an exhaustive investigation and published numerous reports declaring the necessity of such reorganization, in order to promote efficiency and conserve the public funds. It is then recited that upon organization of the 84th General Assembly, which met last January, special committees were appointed in each House to consider the recommendations of the former committee, that the Governor recommended action along the general lines indicated, and that wide publicity was given to the various plans. It is then recited that according to the annual reports of the auditor of state the balances subject to draft in the general revenue fund, from which many of the activities of state government are supported, have shrunk from more than two million dollars on *642 June 30, 1919, to less than one million on June 30, 1920, all of which and more is covered by unlapsed appropriations for the preceding fiscal year, and it is then said that this clearly indicated the immediate necessity either for increasing the revenues of the state or for effecting such reorganization of the state government as would tend to preserve the present revenue; that general economic conditions make increased taxes highly undesirable at the present time.
Having read the above, one naturally looks to the act to find the provisions that meet the needs stated, and there is not one word which even pretends to accomplish such a purpose, or which even seems to contemplate that end. But the particular thing to be observed is that there is not in that statement anything that constitutes an emergency or indicates any necessity for the immediate going into effect of the provisions of the law under investigation, in order to secure the preservation of the public peace, health or safety. Those recitations have no relation to the public health, peace or safety.
The recital continues by stating that at the convening of the 84th General Assembly numerous vacancies occurred in various state offices, and in various state boards, and other like vacancies have occurred since that time; that by reason of the known probability of a reorganization, such as is embodied in this act, persons appointed to fill such vacancies have uncertain tenure and are thereby deterred from initiating and carrying through definite administrative policies; that in several in *643 stances such appointments have been accepted temporarily only, pending early reorganization. That is to say, the legislature has solemnly declared that because of the fact that it has proposed to adopt a comprehensive and revolutionary reorganization bill the efficiency of the state government has been affected, and that the activities of the government are impeded while awaiting the accomplishment of the impending changes. It amounts to a declaration by the legislature that it has itself brought about a state of confusion which is hurtful and undesirable, but even then it does not disclose in this situation any relation to the public health, peace or safety, or to the necessity that the provisions of this particular law should go into immediate effect for the preservation thereof.
If the reorganization of the administrative departments of the government, the machinery of government, so as to change the form theretofore held, is an emergency necessary for the preservation of the public peace, safety and health, then the creation of any new powers, or the suspension of any existing powers, could be declared by the legislature to have been made in order to meet an emergency of that character, and such would amount to a declaration that the initiative and referendum was a meaningless thing to be set aside by the general assembly at will — a dangerous proceeding which tends to destroy the confidence of the people in their government.
Then follows the provision that as a result of all the foregoing the state service in the appointive state departments, shown by said investigations to *644 be wasteful and inefficient, is becoming increasingly demoralized; that all of these departments exercise functions pertaining to the protection of the public health, the conservation of the public peace and morals, or the promotion of the public safety.
It is a sufficient observation as to the sentence just quoted to say that the provisions of the statute involved in this case, in specific terms, keep alive the old laws providing for and controlling the departments referred to which “exercise functions pertaining to the protection of the public health, the conservation of the public peace and morals, or the promotion of the public safety.”
The act contains on its face the complete refutation of the necessity of its becoming immediately effective in order to preserve the public peace, health or safety.
By Section 4 it is provided that the reorganization shall be put into effect at the commencement of the next succeeding fiscal year, that is to say, July 1. The date of the law is April 26, 1921. By the terms of the constitution the electors would have until July 26 to take the necessary steps for a referendum. As the new law by its own terms does not become effective until July 1, it is difficult to accept the suggestion that there is such an emergency affecting the public health, peace or safety as demands that the people shall not have those 25 days in which to act themselves.
A very considerable portion of the opinion of the majority in this case is devoted to the exposition of the uniform rule, everywhere accepted, that courts will not hold laws to be unconstitutional unless *645 found to be clearly violative of some express constitutional provision, and the names of a number of eminent men, who have made lasting and valuable contributions to our system of jurisprudence and to the development of our American institutions, are given, and decisions of this court are cited in which this well-accepted principle is recognized.
I am wholly unable to see the application of those principles to the case we have here. The question of the validity and constitutionality of the reorganization act is not here involved. What is here contended is that when the legislature in obedience to the constitution stated the reasons why the people should not have the right to exercise the referendum privilege given them by the constitution, and when it stated the reasons why this law should go into immediate effect, because necessary for the immediate preservation of the public peace, health and safety, it was plainly to be seen that those reasons had absolutely no relation to the subject stated.
The rule which declares that no law shall be held by the court to be invalid unless clearly in violation of the constitution is a most salutary one and contributes to the orderly administration of government, but it is more than a hundred years since Chief Justice John Marshall, by his unanswerable logic in Marbury v. Madison, 1 Cranch, 137, demonstrated the power and duty of the court to make that declaration when a statute does violate the constitution.
Now, surely the legislature has no more right to say that a bill is an emergency measure, when upon *646 its face it plainly is not, than it has to pass a statute which plainly violates the constitution. Neither has it any right to conclusively bind the people and the court by setting forth reasons which declare the existence of an emergency which creates the necessity for an emergency law necessary for the immediate preservation of the public health, peace and safety, when it is apparent from an inspection of those reasons that they do not disclose any such emergency or such necessity.
As stated above, I agree with the majority that where there is doubt as to the constitutionality of a statute the doubt should be resolved in favor of its validity and the legislative power conferred upon the general assembly should in such case be upheld. So in this case the legislative power conferred upon the people by the constitution should be upheld; and where there is doubt as to the sufficiency of reasons or declarations for taking away this constitutional right of the people, that doubt should be resolved in favor of the constitutional privilege which belongs to the people.
I commend the anxiety expressed in the majority opinion concerning the advance of anarchy, bolshevism and communism. The followers of those dangerous cults are all opposed to constitutional government. Each approaches' the same destructive end, but along different lines. They all oppose property, contract rights, and all of the inalienable rights secured by the guaranties of our constitution. I know of no more ■ effective way to promote the advance of the disintegrating influences referred to than by creating the impression that by illegit *647 imate and unconstitutional practices the strength and vitality of constitutional government is being undermined.
The question in this case is not whether the referendum is wise or unwise, but whether a provision of the constitution, regularly adopted, and written in plain and simple language, may be ruthlessly swept aside. The court has of right absolutely nothing whatever to do with the wisdom of that provision. Its only anxiety should be for the firm enforcement of the constitution.
Suppose the courts of the country in the years since the establishment of the government had been less mindful of that duty, how different our history might have been. The best guaranty that the courts of last resort will fully meet their great responsibilities will be found in their firm and fearless adherence to the fundamental law. The value of their contribution to the success of constitutional government will be measured by the degree of public confidence which they inspire.
I am convinced that whatever may be said, the vast body of our citizenship have learned to have faith in the courts of the country. Comparatively few of the people have seen the United States Supreme Court or the Supreme Court of their respective states. The ordinary good citizen knows very little of their procedure or of their jurisdiction. But he has within him a simple abiding faith that the unalienable right to life, liberty and the pursuit of happiness, which were assured to. him- in the great Declaration, will be preserved to him by the courts. Who shall say that it is not a noble *648 faith? He knows that the government is the instrument, the concerted plan of the people, to secure those rights and preserve the orderly processes of society, and he has been deeply imbued with the principle that he has a right to participate in that government. That faith is the most essential element by far to the maintenance of that powerful thing, spiritual and material, which we call America.
There is no more delicate thing than public confidence. Constitutional government, free institutions, the republic, cannot exist without it. It must never be forgotten that our whole constitutional system rests upon popular sovereignty.
I cannot give my consent that this provision of the constitution shall be set aside and shorn of its practical vigor by the legislature, and the people be left without the right which they supposed they had secured to themselves.
The reasoning of the great Chief Justice, John Marshall, in Marbury v. Madison, to which I above referred, cannot be too often impressed upon the courts, the legislatures and the people.
“To what purpose,” said he (page 176), “are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed, are of equal obligation. It is a proposition too plain to be contested, that the constitution con *649 trols any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.
“Between these alternatives there is no middle ground. The constitution is either a superior paramount law,, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it.”
Cheerfully conceding that the majority have conscientiously arrived at a different conclusion, I have felt it my duty to place this dissent upon the record in the hope that it might to some extent operate to check further tendency by the general assembly to disregard the plain provisions of our constitution, however vain and fanciful that hope may be.